**2009 BNH 029**
_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| In re: | Bk. No. 08-13502-JMD |
| | Chapter 7 |
| Kathryn A. Finnerty, | |
|         Debtor | |
| | |
| FIA Card Services, N.A., | |
|         Plaintiff | |
| | |
| v. | Adv. No. 09-1044-JMD |
| | |
| Kathryn A. Finnerty, | |
|         Defendant | |

*Marc L. Van De Water*
*Van De Water Law Offices, PLLC*
*Bow, New Hampshire*
*Attorney for Plaintiff*

*Kathryn A. Finnerty*
*Pro se Debtor/Defendant*

## MEMORANDUM OPINION

### I. INTRODUCTION

FIA Card Services, N.A. ("FIA"), filed this adversary proceeding against Kathryn Finnerty (the "Debtor") under § 523(a)(2)(A) of the Bankruptcy Code[1] seeking a finding that $6,900 in charges and cash advances the Debtor put on her credit line is nondischargeable. The

---

[1] In this opinion the terms "Bankruptcy Code," "section" and "§" refer to title 11 of United States Code, 11 U.S.C. § 101 et seq., as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8.

Court held a trial on October 9, 2009, at which both parties submitted evidence, and the Debtor testified on her own behalf.  After considering the testimony and evidence, the Court finds the debt in question to be dischargeable because FIA did not meet its burden of proving that the Debtor's representations were knowingly false and that she had the intent to deceive when she made them.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

**II.  FACTS**

The Debtor held a credit account with FIA.[2]  Between July 15 and August 19, 2008, she incurred the following cash advance or convenience check charges on her account:

| Transaction Date | Description | Amount |
| --- | --- | --- |
| 7/15/2008 | Self-check | $1,000 |
| 7/24/2008 | Self-check | $2,650 |
| 8/4/2008 | Self-check | $500 |
| 8/7/2008 | Check | $250 |
| 8/19/2008 | Self-check | $2,500 |

After incurring the charges on her FIA account, the balance on the Debtor's account was within about $500 of the $12,300 credit limit.

The Debtor testified at trial that she has been unemployed since January 2007.  She previously worked as a litigation paralegal for several large law firms in Washington, D.C. and

---

[2]  The Debtor's original account holder was MBNA America Bank, N.A., later acquired by Bank of America.  For simplicity, in this opinion the Court refers only to FIA.

2

Boston. She filed her chapter 7 petition on November 26, 2008, after concluding that bankruptcy was her only remaining option. She explained that she deposited the cash advances and checks from her FIA account into her own checking account and used the money to pay the first mortgage and equity loan on her home to keep the payments current while she was trying to sell her home. She testified that she was focusing on keeping the loan payments current because she wanted to protect the marketability of the home. If she was successful in selling her home, she planned to use the proceeds to satisfy her outstanding debts.

On September 2, 2008, the Debtor wrote a letter to FIA explaining that she would no longer be able to make the minimum payments on the account. With that letter the Debtor also included three money orders for $100 each, which she said represented "good faith" payments on three of her accounts, one of which is at issue here.[3] In the letter the Debtor explained that she had used her various lines of credit to cover her expenses over the previous eighteen months. While she remained unemployed, her only source of income was about $1,152 in monthly social security benefits and some financial help from her family. The Debtor also explained that she put her house on the market in mid-June 2008 and listed it on various real estate websites. Her initial asking price for the house was about $446,900. She closed her letter by stating that her only other alternative might be bankruptcy, which she found unacceptable at the time because she believed her house was a valuable property. She also returned two of the credit cards with her letter and requested that all three of her accounts be closed. In addition, the Debtor stated that she intended to honor her unsecured debts. The Debtor's testimony at trial was consistent

---

[3] Pl.'s Ex. 8.

with her September 2, 2008 letter. At trial, however, she also explained in detail the difficulty she had in selling her property and her eventual decision to file for bankruptcy.

In April 2006, the Debtor's neighbors filed a petition to quiet title against her in New Hampshire Superior Court. The neighbors claimed that the Debtor's garage, retaining wall, and patio encroached on their land.[4] During the course of that litigation, the Debtor testified that her attorney advised her that she had a very good defense against the suit. She also testified that she spoke with other attorneys whom she knew or worked for. After reviewing the case with her, they apparently told her that she had a good chance of winning. Her belief in the merits of her defense was based upon these conversations, legal advice, and the fact that the Superior Court had twice denied summary judgment for the neighbors.

The Debtor began to market her property for sale in mid-June 2008, while the litigation was pending. She testified that several buyers expressed interest in the property but no one was willing to purchase it because of the risks of the pending litigation. Meanwhile, the Debtor also used her FIA account and other accounts in July and August 2008 to pay the mortgage and home equity loan to keep payments current and hopefully sell the property. The Debtor continued to reduce the sale price on the property every few weeks, eventually listing it for $350,000, but she still did not have any success in selling it.

On September 17, 2008, after about twenty nine months of litigation, the Superior Court entered an order against the Debtor requiring her to remove the garage, retaining wall, and a portion of the patio. After the Superior Court decision, the Debtor tried to negotiate a parcel swap or some other settlement with the neighbors, but they refused. The Debtor explained that

---

[4] The neighbors also apparently obtained a $30,000 prejudgment attachment on the property.

she was shocked by the Superior Court decision and could not afford to finance an appeal. By the middle of October 2008, the Debtor testified that she determined bankruptcy was her last option.

On her bankruptcy schedules, the Debtor valued her property at $300,000, which reflected the property's postjudgment value because any buyer would have to deal with the neighbors' adverse judgment. The Debtor believed the property still had about $50,000 to $60,000 in equity after accounting for the first mortgage and home equity loan. Eventually, the Debtor later deeded the property back to the mortgagee sometime in January 2009.

## III. DISCUSSION

### A. Sufficiency of the Complaint

If the parties had not been ready for trial on October 9, 2009, the Court was prepared to issue an order to show cause why the complaint should not be dismissed for failure to state a claim.[5] A "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)). While a complaint does not require detailed factual allegations to survive a motion to dismiss, it must contain more than labels and conclusions. Bell Atlantic, 550 U.S. at 555. A pleading that offers only a formulaic recitation of the elements of a cause of action must be dismissed. Iqbal, 129 S.Ct. at 1949; Bell Atlantic, 550

---

[5] A trial court may dismiss a complaint on its own initiative, and without an adversary's motion, if the complaint fails to state a claim upon which relief may be granted, provided, however, that the trial court adopts a fair procedure for doing so. See Martinez-Rivera v. Sanchez Ramos, 498 F.3d 3, 7 (1st Cir. 2007). Generally that means the court must notify the pleader of its intention to grant sua sponte dismissal and permit an opportunity to amend or otherwise respond. Id.

U.S. at 555. A complaint that simply pleads facts that are consistent with a defendant's liability is not sufficient. Iqbal, 129 S.Ct. at 1949; Bell Atlantic. 550 U.S. at 557. The complaint must allege facts which will establish a plausible claim for relief. A complaint has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S.Ct. at 1949.

The complaint in this case appears to consist of "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Id. However, the Debtor did not question the sufficiency of the complaint and, because both parties were prepared for trial, the Court chose not to raise the issue and proceeded to decide the case on the evidence submitted.

### B. Standards and Scope of § 523(a)(2)(A)

Section 523(a)(2)(A) prevents debtors from discharging any debt

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A). Courts, of course, are not omniscient. A debtor's schedules and other required disclosures under the Bankruptcy Code only provide so much. As a result, any party seeking to prevent the debtor from discharging a debt to it bears the burden to show that its claim comes squarely within an exception in § 523(a). McCrory v. Spigel (In re Spigel), 260 F.3d 27, 32 (1st Cir. 2001). The right to a discharge is ordinarily construed liberally in favor of the debtor. Boroff v. Tully (In re Tully), 818 F.2d 106, 110 (1st Cir. 1987). And the reasons for denying a discharge must be real and substantial, not merely technical and conjectural. Id. Thus, exceptions to discharge are narrowly construed to further the Bankruptcy Code's "fresh start" policy for debtors. Spigel, 260 F.3d at 31-32.

To establish that a debt is nondischargeable under § 523(a)(2)(A), a creditor must show that: (1) the debtor made a knowingly false representation or one made in reckless disregard of the truth; (2) the debtor intended to deceive, i.e., scienter; (3) the debtor intended to induce the creditor to rely upon the false statement; (4) the creditor actually relied upon the misrepresentation; (5) the creditor's reliance was justifiable; and (6) the reliance on the false statement caused damage. Spigel, 260 F.3d at 32; Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir. 1997). The standard of proof for each element of a § 523(a) claim is by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279 (1991).

**C. Analysis**

A debtor makes a false representation under § 523(a)(2)(A) by misrepresenting her intentions about something, such as a promise to act. The First Circuit summarized this element as follows:

> A representation of the maker's own intention to do a particular thing is fraudulent if he does not have that intention at the time he makes the representation. The state of a man's mind is as much a fact as the state of his digestion. Likewise, a promise made without the intent to perform it is held to be a sufficient basis for an action of deceit. On the other hand, if, at the time he makes a promise, the maker honestly intends to keep it but later changes his mind or fails or refuses to carry his expressed intention into effect, there has been no misrepresentation. This is true even if there is no excuse for the subsequent breach. A debtor's statement of future intention is not necessarily a misrepresentation if intervening events cause the debtor's future actions to deviate from previously expressed intentions.

Palmacci, 121 F.3d at 786-87 (citations and quotations omitted). The test then is that if a debtor did not intend to perform the promise at the time she makes it, then she has made a false representation and the debt that arose as a result is not dischargeable, assuming all the other § 523(a)(2)(A) elements are met. Id. at 787. If, however, the debtor intended to perform at the

7

time she made her promise, but she later decided that she could not or would not perform, then her initial representation was not false when made.  Id.

The scienter element of this test—intent to deceive—is satisfied if the creditor proves that the debtor made the representation either: (a) knowing or believing that the matter is not as she represents it; (b) without confidence in the accuracy of the representation; or (c) knowing she does not have any basis for the representation.  Id.  Creditors must show fraudulent intent, which requires an actual intent to mislead, more than mere negligence.  Id. at 788.  "An honest belief, however unreasonable, that the representation is true and that the speaker has information to justify it is an insufficient basis for deceit."  Id.  However, the unreasonableness of the belief may be probative of the debtor's intent to deceive if the totality of circumstances provides such an inference.  Id. at 789; Rizzo v. Mindes (In re Mindes), 412 B.R. 8, 14 (Bankr. D.N.H. 2009).

FIA's theory in this case is one of implied representation.  Because credit card issuers pursuing § 523(a) nondischargeability claims can rarely show with direct evidence that a debtor did not intend to repay the debt, courts often say that a debtor's intent may be inferred from the totality of the circumstances.  See, e.g., Chevy Chase Bank FSB v. Kukuk (In re Kukuk), 225 B.R. 778, 786 (B.A.P. 10th Cir. 1998).  Some courts have cited a list of twelve factors to help determine a debtor's intent to repay.  See, e.g., Compass Bank v. Meyer (In re Meyer), 296 B.R. 849, 859 n.14 (Bankr. N.D. Ala. 2003) (listing factors).  FIA points to those factors and argues, among other things, that the Debtor was contemplating bankruptcy when she wrote the checks on her FIA account in August 2008—based on her September 2, 2008 letter—and that she timed her bankruptcy filing so the charges on the FIA account fell outside the 90-day window before bankruptcy, presumably to avoid the presumption of nondischargeability in § 523(a)(2)(C)(i).

FIA also argues that another factor—the Debtor's financial condition at the time the charges were made—supports an implied intent not to repay because the Debtor had been accessing her credit cards to save her property and any potential equity for almost eighteen months at the time she made the charges on her FIA account.  Based on the evidence and testimony at trial, the Court finds that FIA did not meet its burden on either the first or second elements of the § 523(a)(2)(A) test.

### 1. Knowingly False or Fraudulent Representations

First, the Debtor did not make a knowingly false representation or a representation with reckless disregard of the truth.  Here, all the evidence suggests that at the time the Debtor made the charges at issue, she had a reasonable basis for believing that she would be able to sell her property and for believing there was enough equity in the property to pay back her creditors.  Although she did not have enough income to make minimum payments on this account in July and August 2008, it was at least reasonable for her to believe that she would be able to use the proceeds from the sale of her home to pay her unsecured creditors.[6]

She testified that her property received over 300 views on real estate websites and many interested buyers had contacted her or stopped by the home for viewings.  She said she never intended to file for bankruptcy until the Superior Court's decision in mid-September, after she made the charges at issue.  Before then, the Debtor also had a reasonable basis for believing she would win the litigation with her neighbors.  The Superior Court had twice denied summary

---

[6] That the Debtor used her available credit while she did not have the income to pay back the charges in full is not a false representation in and of itself.  That is the very purpose of credit—to make purchases while lacking the ability to pay in full.  See Chase Bank USA, N.A. v. Ritter (In re Ritter), 404 B.R. 811, 824-25 (Bankr. E.D. Pa. 2009); Webster's Third New International Dictionary 532 (1981) (defining credit as "an amount or limit to the extent of which a person may receive goods or money for payment in the future" and "an amount or sum placed at a person's disposal by a bank").

judgment for the neighbors, and the Debtor apparently was told by a few different attorneys that she had a good case. And the Debtor reasonably believed she had equity in the property to pay off her credit cards. Her final asking price before the Superior Court decision was $350,000. The balance on the Debtor's first mortgage was $170,000 and the balance on her home equity loan was $46,000, which still left about $134,000 in equity to pay her unsecured creditors.[7] The Debtor also testified that she was prepared to keep almost nothing for herself.

Although the Debtor mentioned bankruptcy as a possible alternative in her September 2, 2008 letter, the context in which she referred to bankruptcy suggests that she was only aware of it as an option, not that she believed it was inevitable. Her letter stated that bankruptcy was "unacceptable to [her]" at the time. So when the Debtor wrote that letter, as far as she was concerned, she was going to win the property dispute with her neighbors, sell what she thought was a valuable property, and pay her creditors. Her testimony supports that interpretation, and no contrary evidence was presented.

In addition, the Court finds that the timing between the charges and the Debtor's bankruptcy filing does not reflect any fraudulent intent because of the intervening adverse Superior Court decision. The undisputed evidence supports a finding that the Debtor intended to pay back the charges on the FIA account at the time she made them in July and August 2008, but she only later realized she could not perform after the "shocking" (at least to her) Superior Court decision. Thus, any representation by the Debtor was not false when made. See Palmacci, 121 F.3d at 787.

### 2. Intent to Deceive

---

[7] See Pl.'s Ex. 4-6. The Debtor had about $90,906 in unsecured debts on her schedule F, not including the neighbors' judgment, which she scheduled at $50,000. See Pl.'s Ex. 11.

Second, the Debtor did not have the requisite scienter, or intent to deceive, largely for the same reasons above. The Debtor honestly and reasonably believed that her representation to pay was true because she had information to justify it. During the sale process for her house, she had received several inquiries from interested buyers. Although she was having trouble selling it, she kept lowering the price every few weeks, believing that at some point the price would be right for some buyer, even with risks from the pending litigation. She received credible advice from multiple sources that the litigation against her property would end in her favor. She had a reasonable basis to believe that she could eventually sell the house with sufficient proceeds to pay off FIA and her other unsecured accounts. Her honest, informed belief is an insufficient basis for deceit. Id. at 788. The totality of the circumstances does not provide for an inference of deceit because her belief was reasonable when any representations were made to FIA. Mindes, 412 B.R. at 14. Therefore, the Court finds that FIA failed to meets its burden on the second element of the § 523(a)(2)(A) test.

### 3. Justifiable Reliance

Finally, the Court is not satisfied that FIA justifiably relied on any representations by the Debtor. The Debtor had been unemployed since January 2007. During her unemployment she continued to make at least the minimum payments on her various obligations until the time of her September 2, 2008 letter to FIA. Despite her long-term unemployment, FIA did not alter her status or change any credit limits or privileges at any time during the eighteen months after she last had a job. This Court questions whether FIA could have justifiably relied on any representation by the Debtor after that period of time. See Field v. Mans, 516 U.S. 59 (1995).

During closing arguments, FIA contended that credit card issuers may justifiably rely on a debtor's implied representation of repaying when she accesses her credit, so long as no red flags are raised.  In other words, once credit is established, credit card issuers are justified in doing nothing until there is some breach of the credit card agreement, e.g., a missed payment or exceeding the account's credit limit.  FIA argues that many courts have adopted this justifiable reliance analysis in credit card dischargeability cases after Field.  See, e.g., Citibank (South Dakota), N.A. v. Eashai (In re Eashai), 87 F.3d 1082 (9th Cir. 1996); AT&T Universal Card Servs. Corp. v. Searle (In re Searle), 223 B.R. 384 (D. Mass. 1998).  Eashai involved a credit card kiting scheme in which the debtor used cash advances on one or more credit cards to maintain the minimum monthly payments on all of his cards.  The court found that the creditor had no notice or warning that the debtor did not intend to repay the debt and, therefore, it justifiably relied on the debtor's apparent good faith use of the credit card.  Eashai, 87 F.3d at 1091.  This case does not involve any allegation of credit card kiting.  But this case raises similar concerns on the justifiable reliance element about the notice or warning to a creditor in § 523(a)(2)(A) credit card cases.

Modern technology and information systems now enable credit card issuers to continuously or periodically monitor any number of factors to evaluate their customers' creditworthiness.  Credit card companies look at factors such as the identity of the merchant where a charge is incurred, the number of real estate mortgages on a customer's home, the identity of a mortgagee (i.e., a sub-prime lender), and foreclosures and property values near a customer's home.  Ron Lieber, American Express Kept a (Very) Watchful Eye on Charges, N.Y.

Times, Jan. 31, 2009, at B1. Credit card issuers now have hundreds of data points to use in making decisions about a customer's financial resources. Id.

If a creditor submits evidence of periodic reviews that disclose no red flags together with a history of regular payments by a debtor, its reliance may be justified. See Searle, 223 B.R. at 392 (quarterly reviews). A creditor's reliance may not have been justified, however, when a debtor has been unemployed for eighteen months and the creditor did not submit evidence of periodic reviews. After all, as Justice Souter recognized in Field, "[j]ustifiability is not without some limits." Field, 516 U.S. at 70. Justifiability is also all relative. It is "a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case." Id. A person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." Id. As the more sophisticated party in financial relationships with nearly every consumer, credit card issuers may not stick their heads in the sand for long periods and still claim justifiable reliance when they now have the tools to see a debtor's actual financial situation and they are already closely watching. See Meyer, 296 B.R. at 863; see also Eashai, 87 F.3d at 1090-91 (summarizing the "justifiable reliance" standard by recognizing that "although a person ordinarily has no duty to investigate the truth of a representation, a person cannot purport to rely on preposterous representations or close his eyes to avoid discovery of the truth") (emphasis added).

Nevertheless, FIA failed to establish the first two elements of its claim under § 523(a)(2)(A), so this Court need not determine whether it proved justifiable reliance or the other elements.

13

**IV.  CONCLUSION**

For the reasons set forth above, the Court finds that FIA did not meet its burden under § 523(a)(2)(A) of proving the nondischargeability of the $6,900 in charges on the Debtor's account.  Consistent with this opinion, the Court will enter a separate judgment for the Debtor, and her obligations to FIA are not excepted from discharge under § 523(a).  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

ENTERED at Manchester, New Hampshire.

Date:   October 30, 2009           /s/ J. Michael Deasy
                                   J. Michael Deasy
                                   Bankruptcy Judge